The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to draw an eye and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Please be seated. All right, we'll begin with Overby v. Anheuser-Busch. Mr. Teich. Good morning. May it please the Court. The District Court misapplied the Rule 23 and FLSA standards when it certified a class of hourly employees pursuing off-the-clock wage claims, despite overwhelming evidence of variability in what those employees, who had dozens of different job titles across five different departments, actually did before and after their shifts. I'm going to ask you to speak up and put that microphone close to you. Of course, Your Honor. Thank you. The controlling Rule 23B standard, is that better? From Bojangles, which the District Court did not cite, is that a highly generalized policy to violate the law, founded on a laundry list of factually diverse claims, cannot support certification. As in Bojangles, plaintiffs here failed to meet their burden of showing that common issues would predominate over individualized ones, when proving whether each employee performed work and for how long, whether Anheuser-Busch knew or should have known about it, and their damages. The assortment of tasks employees testified. May I ask you about Bojangles here? Sure. In Bojangles, we had something like 311 or several hundred different little restaurants or outlets, and here we have a single facility outside of Colonial Williamsburg. Isn't commonality and predominance, are they not more likely, when you're dealing with a single facility here, and when we're dealing with 311 different facilities under different immediate management? That might often be the case, Your Honor, but not necessarily, and I'd like to explain why. In Bojangles, there was only one job role. It was shift managers or assistant shift managers. Here, there are literally dozens of different job roles in this single facility. So it is yet only one facility, but there were five different departments, and the types of jobs varied greatly. Just reading through the joint appendix, you can see all the different job titles that are at issue, a brewer, a camera. When you say five different departments, do we know that the PPE and the COVID task and dining and diving were different among the departments? Or were they same under sort of a common structure? That's one thing I haven't been able to figure out from the record, is how much variation there was from department to department. Yes, Your Honor, there was great variability among the different departments and among even job roles within each department. Is that apparent from the record? It is apparent from the record, and it was cited before the district court. The district court did not get into any of the evidence, but I'm happy to point you to some of it. Give us some examples, like taking PPE as an example, whether you're doing it by job type or department. Is there any reason to think that there's variability there? I'm sort of a Judge Wilkinson. I've tried to look through, but had a little difficulty piecing that together. Let's start with PPE, because I think that is one of the central supposed off-the-clock jobs that the plaintiffs point to. For PPE, donning and doffing. They say that everyone is subject to the same requirement to don and doff. I'm looking at JA 848, which is a notice that appears to have been posted. It says in bold, all caps, surrounded by black, expectations mandatory for all, and then it has the PPE policy in it, and it says right at the top, mandatory for all, in bold. Right, so PPE is mandatory for everyone, but let's break that down. First of all, many employees testified that they put on their PPE during their shift, so they were paid for it. That's, for example, at JA 725 and 726. An employee called Zubanko testified that when he put on his PPE, it was during the shift. Some put on PPE, but did so at home. So the PPE that was required was steel-toed boots, ear protection, eye protection, and something called a bump cap, which is a piece of- But they were required under the policy to sanitize their boot bottoms, to sanitize their workstation, to wash their hands. I mean, it's a long list, and every one of these seems to be things that you need to do, or most of them at least, after arrival. And it's my understanding that there was a policy as well in place that all employees were required to be at their workstation throughout their shift, and that they were only paid for their shift, that there was a policy that they were paid exactly for their shift. And for this reason, they essentially had to arrive early to carry out all these tasks prior to beginning to sit at their workstation and do that work. I mean, they can't wash their hands and sanitize their boots at their workstation, right? Well, some of them can, your Honor. It depends on where the sanitation is. But let me talk about this PPE, because I think it's really important. I think the best place to look for the three of you is on pages 14 and 15 of our reply brief, where we walk through what a single employee does, depending on her different positions. This is Abby Gearhart. She's one of the named plaintiffs, so we're not cherry-picking. She says sometimes she has to retrieve or put on specialty PPE like Kevlar gloves for handling bottles or chemicals, sometimes impact gloves for grabbing pallets, sometimes wet suits and boots for cleaning. Sometimes she has to put on sleeves and gloves. She testifies she does many of those things after her shift starts, so she's paid for those activities. Other times she alleges she had to do it beforehand. So I'm saying even for an individual employee, there's an incredible amount of variation. Can you go back to Judge Berner's question again? I understand everybody has to do PPE. Correct. I think this is what you're getting at. It sounds like you're saying for a given person on a given day, as well as for different job titles, what that PPE is varies. That's exactly what I'm saying. So the reply brief talks about how it varies by person. So that particular person does different things, and so PPE looks different on different days for that person. Can you point me where I might look to see variability in the PPE across job types or departments? Sure. Let me give you two concrete examples. Number one, JA-784. This is an employee called Brinson. He's an opt-in plaintiff. He says, I'm a tech planner now, but when I was a maintenance tech, I had to do more preparation prior to my shift than I do now. Different preparation. We have an employee called Zubenko. Do we know that that's what he's wearing? How do we know what preparation means there? Well, let me talk about – I think he's referring to PPE there, but this is another example. The employee is definitely talking about PPE. This is an employee called Zubenko. He says oftentimes for his job, if he was a maintenance person, he would only have to wear the normal PPE, which was eye protection, ear protection, bump cap, which is a piece of plastic put into a baseball cap, and steel-toed boots, some of which he would put on after he arrived at the station. But for other jobs, such as when he was on the chip crew, which essentially required going into the tanks and cleaning it out, he had to put on a full-body wetsuit and rubber gloves and rubber boots, but he testified he did so after his shift started. So he was paid for that work. So the point is for any individual employee – Were there other employees who did the same task but were not paid for the work? I mean, as you're saying, the essential variability is that some employees performed the task, but they were on the clock and they were paid for the work, and that others performed the task, but they were not paid for the work. The question is whether the tasks were on the clock or off the clock, and that's the variability? That's one piece of the variability, but also what they did. Again, if you look at page 14 and 15 for Gearhart, she said it varied day by day, depending on what she was doing. If she was cleaning bottles, she had to put on one type of PPE. If she was cleaning tanks, she had to put on a different type of PPE. If she was doing maintenance, she didn't have to put on any specialized PPE, just the steel-toed boots and the ear protection and the eye protection. Well, what about this? Maybe this is hypothetical. Maybe it's accepted as a hypothetical. Imagine that, as I think is the policy, is that there is a baseline PPE that everybody has to wear. You have to wear steel-toed boots, eyes, ears, and the cap. Imagine that there was evidence that it took five minutes to do this, to put on boots. I don't know whether they're put on at the facility or at home, but let's just say it takes five minutes to do that. Everybody has to do that, and maybe some people do more than that. Some people, what they do varies, but that's just a baseline. Why wouldn't that be like a common question, and so maybe recovery for other stuff doesn't work, but that five minutes, except that they could show that it takes five minutes through some representative data? Yeah. Why wouldn't that, at least in theory, maybe that's not this class, but why wouldn't, in theory, could that class work? In theory, Your Honor, yes. That's Tyson food. That's sort of Tyson food, right? Absolutely, but the point is we're miles away from that here. There's not a single task or activity. In fact, the district court didn't even restrict the universe of potential off-the-clock activity. She said things including PPE, including COVID. We don't even know what the – Just to make sure I understand, your argument is effectively like a procedural objection. You're not saying that there is no class that could be possibly certified here. You're saying the class that was certified and the manner it was certified was improper. Well, it's both a procedural and a substantive class. We think this case is very much like the Ferreris case, which was a 200-person class of all hourly employees at Newark Airport. To follow up on Judge Richardson's point, if the variation is between those who performed the PPE post-on-the-clock and those who performed it off-the-clock, whether they performed it before going to the end of their shift or afterwards, wouldn't that be amenable to – isn't what you're saying that this definition at present is too broad, but it might be amenable to subclassing if there were – if this baseline requirement that Judge Richardson mentioned was performed by a significant number of people prior to their shift and that they were not compensated for it? Well, your – I mean, I think one of the hard questions you have to ask yourself here is maybe this definition as it's presently formulated is too broad, but aren't there a variety of potential subclasses here that would catch commonality for a significant number of people? That's possible, Your Honor, but we think – Well, why shouldn't – if it's possible, why shouldn't the case be remanded for purposes of subclassing? Because it does seem to me that if there's a baseline requirement here, then there's a potential commonality and predominance both. Well, we think the – even PPE, even COVID and other things, there's too much variability even in those. I think at a bare minimum, this needs to be vacated for the same reasons that Bojangles had to be vacated, but we actually think this case is more like Ferraris where it was just a straight reversal because the court said there's just simply too much variability even among the – What is that – how is – Do you want the case not just remanded but dismissed? No, reversed and sent back to the district court for proceedings with the individual. Just say what exactly you want. You don't – you have no objection to having this sent back to the district court to see if there are subclasses that meet commonality and predominance? Well, we do object to that because we do think that this was plaintiff's class. This was the class that they proposed. They didn't try to restrict it. You think there's no possibility at all that a subclass can be formulated that meets commonality and predominance requirement? You say that's just impossible? There's no possible subclass. I didn't say it was impossible, Your Honor. I said I think the appropriate response would be reversal, but if this court thinks that there's some – Does it even matter? Just to help me understand, does it matter? Because class certification can be reconsidered at any time is sort of the theory, and so why does it even matter whether we reverse or vacate? Like the district court could reconsider class certification when new information comes out either way. That's right, Your Honor. We think reversal is appropriate because the district court – this was the class the plaintiffs proposed. It's clearly not certifiable. It violates the Bojangles requirement of including even uninjured class members, everyone who worked at the facility. So at a bare minimum, we think it has to go back to the district court. Reversal or vacate at the end of the day I don't think makes a huge difference. I just think the court should make clear that a class with this level of variability requires the district court to do more to actually engage with the evidence. This is not a mere pleading standard at this stage. The district court is required to actually engage with the evidence and figure out are there certifiable classes. But it's really hard for us to evaluate. I mean you're saying reverse and tell them don't certify. It's really hard for us to evaluate whether there could be or could not be like appropriate subclasses or narrow definitions. I mean I don't even know how I would write an opinion that says, oh, like let me dream up a subclass and tell you why it wouldn't work. That seems like an odd thing for us to do. Like we are, you know, as we repeat a lot, right, of course we'll review. May I answer his question briefly? Sure. I understand, Your Honor, and if vacater is the appropriate response, we accept that. I think part of the problem is the district court just didn't engage with the evidence, so it's hard for this panel to review. So it just kind of assumed based on allegations and plaintiff's assurances that it could try this case. Thank you. Mr. Tucci. May it please the Court. Robert Tucci on behalf of plaintiffs and the putative class. Just to address your question, Judge Wilkinson, regarding the PPE differences here, let's really analyze what happened in the brewery at the Williamsburg Brewery. So the workers, the hourly workers, at minimum, had to don and doff a certain PPE. But the question that he raises, that Mr. Tice raises, is when. That's correct, Your Honor. And that would seem to me a pretty crucial thing as to whether they don and doff on the clock or off the clock and whether that's compensable or whether it's not. Isn't that a significant variation? Your Honor, the benefit here is we have two policies by Anheuser-Busch that were required of every single hourly employee. The first was they had to be at their workstation ready to work at the start of their shift. The second is they had to work to the whistle, meaning they had to work to the end of their shift and remain at their workstation until their shift ended. Necessarily, they had to don and doff their PPE either before their scheduled shift to don or after their scheduled shift to doff. Take the boots as an example. So do you agree that the PPE that was required of everyone were boots, eyes, ears, and the bump cap? That's correct, Your Honor. Right. So is there any reason to think that, like, the employees changed shoes when they got there? I mean, this seems like an odd thing. I mean, I get you have to have steel-toed boots, but I didn't see anything that suggested that people were, like, donning and doffing their shoes. Of course there were, Your Honor. Actually, there's a significant majority of the class members who don and doff their PPE at the brewery in their locker rooms. And so where do we get that, the significant majority do that? Can you just point me to where that is? And then sort of the follow-up question to that is, okay, you've got a majority that do it at the facility versus, you know, a minority that does it at home. Why isn't that the sort of, like, an example of the variability that creates a problem, right? You might define a class that says, you know, for those that put PPE on at the facility, right, they may fall within a subclass, but for those that, you know, prepared them at home, maybe they look different under the law. I'm not trying to take a view on what the state law requires to be compensated, but you might imagine the law looks different if you're putting the boots on at the facility versus putting the boots on at home because you've got to put some shoes on. You see what I'm saying? Why is that variability not part of the problem here that the district court just didn't grapple with? So with respect to your first question, the record site, I don't have a specific site in terms of the majority, but at JA-499, that's Tom Jokers' deposition. He was a general manager for the Williamsburg Brewery. He testified in terms of the required PPE and generally how that process flows within the brewery, as well as Kristen Kraft at JA-1637. That's her deposition transcript and testifying along the same lines there. But along the same lines, saying that the majority of people put steel-toed boots on at the facility? Not the majority, Your Honor. I don't have a record site right now ready for you. But you're representing, I'm not, this is not a gotcha game, but you're representing to me that there is a record site for that. You just don't have it. That's correct, Your Honor. And then additionally, in terms of the variability, this case maps perfectly onto Tyson's Foods. In Tyson's Foods, there were variabilities. In fact, that was the entire purpose of the case. Dr. Kenneth Maracle, who was a plaintiff's expert in that case, performed a time study, and then there were two primary variabilities. One was with the cut and retrim department, where he estimated 18 minutes of work was performed for donning and doffing the PPE there, and then the kill department. We understand that Tyson's Foods says you can have representative evidence and you can average it out and even some variability with respect to damages and variability doesn't defeat class certification. But it surely complicates it to try to, that's a significant, it complicates administration of the class when the commonality is not present on the surface and when you have to determine, well, what the average worker did or what might be the average damage sufferer. So I understand Tyson's Foods, but isn't there a limit to the degree of, to the extent to which we can say, oh, well, we'll get representative evidence and we'll find out across a whole array of people what exactly they did and what exactly they didn't, and then we'll try to take some sort of common theme or common norm. And because part of that inquiry has to be, is the class device a better way? It doesn't have to be the best, but is it a superior way of going about resolving this case? And if you have a Tyson's Food question, doesn't that complicate the administrability of the class mechanism when you have to go Tyson's Food and representative evidence rather than just taking the commonality on its face, which is apparent in many cases? Well, Your Honor, I think the time study and the Tyson's Foods inquiry really goes to manageability. Now, commonality predominance are certainly established by the common policies, the common requirements of the employees at the brewery. It's not a barrier to commonality or predominance to have certain variability among the workers. With Mount Clemens, for example, because Anheuser-Busch is claiming that its own time records, its own time records are not accurate. Plaintiffs can certainly come forward with their own estimate of the time periods at issue, and those time records should be established by a just and reasonable inference. But you're saying to me, well, we're not seeking compensation for the time that someone spends at the gym. That's correct, Your Honor. And we're not seeking compensation for the time that someone spends with a cup of coffee. We're only seeking compensation for the time that they are actually spending donning and doffing, putting on equipment. But is that going to be that easy, really, in determining as a general matter what percentage of the time is spent by the average employee with coffee and at the gym as opposed to donning and doffing the equipment? I mean, isn't that a complicating factor and a difficult inquiry to sort of break down what percentage of time is being spent on coffee and at the gym and what percentage of the time is spent donning and doffing required equipment? Your Honor, we won't be looking at percentages in terms of what's used for personal time versus what's used for donning and doffing or other pre and post-shift activities. What we would be doing is using our time study expert and our damages expert to approximate the time periods at issue. If Anheuser-Busch wants to claim that those time studies or those representative evidence is not— Can you describe to me how you would do this? I asked about the PPE. How would you do that with respect to the handoffs, which I think are somehow included in this class? I have a little hard time exactly understanding. Because there doesn't seem to be any suggestion that they're uniform in any meaningful sense across the various job titles that we have here. How in theory would we do that? Well, Your Honor, it's for the handoffs specifically. There's two points. The first point is under the continuous workday doctrine, the compensable time starts with the first principal activity. That's under Alvarez Supreme Court case. So because the donning and doffing necessarily takes place before the handoff even occurs and the COVID screenings as well, that analysis really wouldn't come into effect in terms of whether that's compensable or not unless those activities are not compensable. Second point is— I don't understand that. Say that again. That may just be that I don't—those words didn't make sense to me. Try it one more time. No worries, Your Honor. So PPE must be donned before the workers can enter the production floor. Totally fair. I get all that, right? But even if your claim prevailed on PPE, you have this like inclusion of pre- and post-shift handoffs that seems to be neither here nor—like it seems to be all over the place. The question is like how do we see some commonality or predominance with respect to that part of this because you're trying to include that as part of the policy, I think, at some level. I guess I'm just having a hard time understanding. Right, and that's kind of where I was going with the continuous workday doctrine because even if those activities were not integral and interdispensable to the principal activities of the workers, it would still be compensable under the continuous workday doctrine. I totally understand that, but what we have is we have widely varying times, if any, for those handoffs based on what I can see in the record. And so I understand your point. If we could figure out how much time was spent and how much time was spent on handoffs was indeed uniform, that might be a useful piece of information. But what I don't see here is any indication that there's common predominance with respect to how much handoff was being done by different jobs at different times and whether it was being done before or after the shift started. It's simply an issue of estimation, Your Honor. There's five departments. And so if we look at— And hundreds of job titles. Well, for each department, there could be a time study performed just like in Tyson's Foods, right? Before you can do a time study, you've got to have some commonality, right? You don't get just to say, like, we have these wide variations. But we could just do a time study, and we'll average, to use the example of their own PPE, we'll just average the guy putting on the wetsuit with the guy that's putting on a pair of boots, and then we'll award that much money to all of them, right? The wetsuit guy is just a different situation than the boot guy. It might take some people longer or shorter periods of time to put on boots and eyeglasses. But the person putting on the wetsuit seems to me to not be part of the same time study that we just throw it all in and sort of average it out. That seems like the commonality problem. I disagree, Your Honor. I don't think the record indicates that it's that variable. But even if it were— What is that variable? You think the record doesn't show that some people put on wetsuits as PPE? No, I do. I think in terms of the handoffs, in terms of it being per position level of variability. I think certainly by department that's warranted. But in terms of addressing the variability— Wait, by department? But the class doesn't treat them differently by department. Well, Your Honor, that's more of a damages issue. It's not really—all of these workers were subject to some level of pre-or post-shift work. Okay, give me the site for that. So if I wanted to write that sentence in an opinion that says the evidence below showed that every worker was subject to some pre-shift handoff that was before their shift started, what would I look at? Not in terms of the handoff necessarily. In terms of pre-shift work and post-shift work. I know, but I'm asking about the handoff, right? I thought you just said everybody had pre- or post-shift handoff. No, Your Honor, my apologies. But we agree that not everybody had pre- or post-shift handoff. For certain days, maybe not for individual workers. But the class includes them whether they had it or didn't. So they're going to get compensated for it. This class would treat them as having had it. Well, a good comparison to that, Your Honor, would be Bojangles. The pre-shift checklist only applied to 80% of the shift managers in that case. So the court found no problem with commonality or predominance for that claim. It would be no different here. But do you think in Bojangles the class could have included the 20% that didn't have the checklist? Of course, yes. And then at the damages stage, the workers that did not perform the work would not be awarded the damages. Mount Clemens answers this problem. The Supreme Court addressed this over 80 years ago. It's a burden-shifting analysis. The plaintiffs come forward with their representative evidence or time studies to establish the amount and extent of work as a just and reasonable inference. The burden then shifts. Let me ask you one question. I'm very uneasy with the way that the class has been formulated. And Judge Richardson does suggest a number of fault lines in the class where there's enough variability there to give us concern. One question I had with respect to variability was, are there workers here who are being in the class and dumped into the class who were only hired after the COVID threat had eased and the COVID protocols were taken off? Oh, certainly, Your Honor. We haven't seen the class list. But isn't that a significant? If we're trying to throw into the class employees who were working during the protocols where the tasks assigned were greater and those who were employed after the protocols had been lifted. I mean, and yet somehow they're all part of the class. Your Honor, I think you're looking at the per task nature of the case rather than the actual underlying what's required of the merits. Simply the question is, was work performed that should have been compensated for? No, the question is whether there's sufficient commonality to have a class. And one of the things that concerns me is that it seems to me that there could be dramatically different requirements depending on whether somebody worked while the COVID protocols were in place and somebody who worked after the protocols were lifted. Then those are different groups. The class certification is individuals who are employed at any time starting July 1st, 2020. At what point? I'm assuming that these COVID protocols were in place at the point that this class or class date begins. That's correct, Your Honor. Then the COVID screenings went through January 2023. And Judge Wilkinson, in terms of your question, Anheuser-Busch agrees with us in terms of the overall scope of the merits. On their reply brief, they cite in their introduction two questions that are central. Whether they are members of the class or whether the definition now that is proposed for the class includes those who were employed after the protocols are listed. My apologies, Your Honor, I missed your question. I want to know whether the present class definition includes those employees who went to work and were employed only after the COVID protocols were lifted. Your Honor, we have not seen the class list, so I can't represent to you whether that is true or not. There are bound to have been some people who were employed after the protocols were lifted. You don't need to see a list. Anheuser-Busch has represented that, but I cannot represent that to you because I don't know. Was there any practical reason? You said did they somehow stop hiring people after the protocols were lifted? No, Your Honor, I'm not saying that. They continued to hire people, so there must be, in these kinds of jobs, there must be a decent degree of turnover. And so the present class, the classes as presently formulated would include people who were never subject to the protocols at all. I don't know where that's set in the record, Your Honor, but we certainly have not seen the class list. But I'm not disagreeing with you that new employees could have been employed. I just don't know that. Do you have any objection to a subclass that takes into account that variable? I would, Your Honor, because every single class member, as is defined right now, performs some level of pre- or post-shift work. Well, what about the people who were employed after the Virginia statute was amended? You've got the VOA statute, and then there were employees subject to pre-amendment, and there were employees subject to post-amendment versions of the same statute. That goes to damages, Your Honor. It's simply a matter of what part... No, it doesn't just go to damages. The fact that you can't just completely separate the class definition from damages. Often the damages stem from... they're really sort of interrelated because the variability in damages often is an outgrowth of the lack of commonality among the class. Those are not two... you can't... they're different. I get that. But they can't be cleanly bifurcated. Well, sure they can, Your Honor. It's certainly... it's just a matter of what part of the pre-post-shift tasks were compensable during... No, but the fact that there are very different calculations of damages can trace back to the fact that there was a lack of commonality within the class. Your Honor, we're not proposing a different method to calculate damages based off of a different law or so forth. We propose a time study expert. We propose a damages expert. Both will be able to easily and manageably address the issues in this case. For the VAWA pre-2022 amended version, it's just a matter of what part of it is compensable, what part of it can be paid to the class members. That's during that time period. We're not addressing the pre-2022 amended VAWA post-amendment. Can I ask maybe a higher order question? So I understood Bojangles to suggest that one of the challenges is sort of the level of generality problem, and this is a problem obviously that pervades law as a general matter. But I take your class definition effectively to be like this is work that was unpaid because it's before the time started, before your shift started, or maybe after sometimes too. I can't quite figure that part out, but – and that's sort of how you're defining it. And I sort of understood Bojangles to say you have to actually do it by policy and so that you would have to actually define this by like the PPE policy. And so that might be a group or a subclass of some sort. The COVID policy, like that's a different policy. The handoff might be yet a different policy, and that simply trying to aggregate those as saying uncompensated work is the wrong level of generality. Can you respond to that? And I'm sure that Judge Wilkinson will give you a minute to do so. And if I may have a moment to respond, Judge? Yes. Yeah, sure. Thank you. Your Honor, the difference between what Bojangles described as a general policy, so to speak, that's more going towards commonality and predominance. The class definition, in this case, Anheuser-Busch's objections to it are really form over substance. There is no class member that didn't perform pre- and post-shift tasks ever. At that level of generality, right, like fine, but the problem is you've just defined it up a level of generality, right? We know that there were class members, or at least except my hypothetical, there were class members who did not go through COVID screening because they were hired after January of 23, right? So we don't know that with respect to all of them. If we look at the level of generality being each policy, you just want to take it up to a high enough level of generality, which is what Bojangles tried to do as well, and say, well, we'll take these different policies, and if we group them together in a way that suggests that it's like when the law was violated is our definition, well, then they look common because we've like aggregated disparate things up into a single high-level generality point. Well, Your Honor, Bojangles, in terms of the generality, the district court there only cited this pre-shift checklist for a diverse range of claims for both pre- and post-shift work. And I take Bojangles to say you need to look at the actual policies, right? You can't do this sort of aggregate thing, and what you seem to be doing here is an aggregate thing. We're taking multiple policies, right? The COVID policy is different than the PPE policy, is different than the handoff policy, and you're trying to create sort of a generalized policy of don't pay your workers what they're owed. Your Honor, I think just as our friends in the National Employment Lawyers Association, Metropolitan Washington Employment Lawyers Association in their amicus brief indicated, there is no written policy requirement under the FLSA or these wage laws. There just simply is not. No, it doesn't have to be, and so the handoff policy might not be written. I don't care if it's written or not. Some of these are written. Some of these aren't, but that doesn't make a difference, but they are distinct. You just think we should move them up a level of generality so that they can aggregate and create common questions. There's no generality here, Your Honor. The policy is Anheuser-Busch compensated its hourly workers for their scheduled shifts. That's it, unless an exception was made, which they have pointed to nothing in the record indicating an exception was made for PPE or COVID screening or so forth. Judge Richardson makes a good point, I think, because what we're trying to do, what we tried to do in Bojangles is say, please do not send us something that is just as broad as all outdoors. Please do the defining and the specificity work that's necessary for commonality and predominance. Please do that at the district court level, and please do not send us up here something that is broad and has all kinds of disparate groups folded into it. It's not that Bojangles was unreceptive to class certification. Judge Richardson says it was skeptical of the level of generality that's being adopted in class definitions. Work that should be done at the district court, work that would give rise to a legitimate class, that would easily satisfy Rule 23A and 23B, if only a little bit of the specificity work would be done initially. And that is the difficulty. I'm not unsympathetic to the idea of compensation for workers for donning and doffing and for certain tasks and everything. It's just the fact that when I look at the definition of the class here, it immediately came to mind, well, there's this segment and that segment and this difference and that difference. I think Judge Richardson has pointed out a number of those differences, and I have some others that I'm concerned about. But it's not to say that you can't bring it, that you can't find a class action here. Do you know what I'm saying? Judge Wilkins, I think I do. And my response would be that the class members at minimum are similarly situated. They don't have to be identically situated. No, no, you're right. You're right about that. And I don't think that it's going to be impossible to have an identity. You can't have an identicality with that many people involved. And so at some level, every class member here performs some pre-shift, some post-shift tasks. Why would we need to separate the different tasks in the class definition? It's form over substance. We can address that at the damages stage. There's no need to do it in the class definition. Why would we send separate notices out to these class members for each task? Do you agree that at the damages stage that there are going to be different damages models for different job types? There will be different estimates for different tasks performed for different jobs or different departments, certainly, Your Honor. Okay. And we would just ask that the court affirm the district court's decision in full certifying the class. Thank you. Thank you, Mr. Todd. Thank you very much. I'd like to make three points, if that's okay. I'll start off with the Bo Jangles point. My friend on the other side says, well, everyone performs some pre-shift, some post-shift tasks. Anna Zabush disagrees with that, but that is exactly what happened in Bo Jangles, where everyone alleged there were certain tasks before and after their scheduled shifts. I'm not convinced. I think there may well be a class action here, as long as it's properly defined. I don't want you to misconstrue my comment or what I think Bo Jangles was getting at. It's not to say that there can't be a class action, and there may well be a class action here, and these folks are not seeking compensation for going to the gym or having a cup of coffee. They're not asking for that. Correct, Your Honor. But the question is, again, you know, I just think that there are a number of ways in which this situation, in which this definition can be made more specific and in which subclasses can be made, that because those rules, I mean, the Supreme Court's made it clear in innumerable cases, and Helm and others, that these requirements of commonality and predominance have to be taken very seriously. Correct. So, Your Honor, so I take that point very seriously, and you can imagine a class like in Tyson's Food where there's a single type of activity, donning and doffing, and if the plaintiffs want to propose that on remand and say, we'd like to propose a donning and doffing class, then we can have a fight in front of the district court about whether the tasks are sufficiently common among all the different departments. On that point, I would point you, I would urge the court to read JA 1199 for about five more pages through 1206. That's a discussion of all the different tasks a single employee did pre-shift in terms of donning and doffing. She said it depended on the job. Sometimes she didn't do it at all. Sometimes she had to put on a lot. Sometimes she did it during her shift. I think that gives you a good flavor of the kind of variability we're talking about here. But, Your Honor, I take your point that there might be some hypothetical class. It's just the district court didn't find it. Unfortunately, the class definition has all sorts of problems, but there is a core justice to what the plaintiffs are contending here. What they're saying is, we're doing work. We're doing work that's required by the company, and we're not getting paid for it. I don't believe it's not the kind of thing that can be written off with a de minimis exception. I don't go along with that. Right. The whole question is, we have to take those textual requirements in Rule 23 seriously, but there may well be a class action or several class actions here that will give these folks the payments that they're due. Right. Well, that is their allegation, to be clear. We haven't had a summary judgment briefing yet. We don't actually know if there's a question of material fact along those lines, Your Honor. But I take your point that, yes, at this stage, the question is, do individual differences – I mean, do common issues predominate over individualized ones? And I think at least – You said you had three points. You've hit one, it sounds like. Can you just quickly give us the other two? Sure. Because I've got one other question, but I want you to get your three points out. Sure. Well, I've covered some of it in my responses to Judge Wilkinson. But I guess I would just say there's dozens of different job titles in this record – forklift operator, palletizer, QA analyst, ingredient analyzer, calibrator, et cetera. Each of those would require a different analysis to determine what they were doing beforehand. And I think it's crucial to know that this is, again, not a PPE class. It's not a Donning and Doffing class. It's not a COVID class. It's an open-ended class. Can I ask the question that I asked your colleague? Yes. So if I read Bojangles in part to be about the level of generality problem that sort of says you can't just abstract up to put different forms of off-the-clock work together, can you tell me why you think your colleague's position doesn't work? Because he says, no, no, no, we have an actual policy here. And I take him to be that it sort of has two parts that work together. One is we pay shift time only, and two, you must be at your station at the start of the shift. And if that's the policy, I take his argument to be at that level of generality, we know that there's some work that is done before that. And what exactly that is, we'll figure out as discovery goes on. But that's the right level of generality for the Bojangles problem. Can you tell me whether you think that's the right level of generality? And if not, why not? Well, I think a couple of things, Your Honor. I think – do you mind if I answer? No, no, please. Thank you. A couple of things. Number one, it's the same generalized policy of being worked off the clock. That is what Bojangles said. If you look at the Bojangles allegations, they were very similar in terms of requiring various tasks before shift, requiring various tasks after shift. I think that's the level of generality. What they point to are allegations of a couple of policies that they allege Anheuser-Busch are in violation of the law. But there's actually nothing illegal about paying people for shifts or for requiring them to be at their stations ahead of time unless they're requiring uncompensated work beforehand. And the main point I'm trying to get at is there's so much variability in this record by department, by individual, by shift, even by day. There were several employees, JA1327, to do your pre-shift tasks very day to day. Yes, they do. It wouldn't be fair of me to comment on what each individual employee did because everybody's different. If you look through the record, I think a fair reading, it's just at least this class that these plaintiffs proposed, they could have tried to narrow the class in line with Bojangles or other case law. But instead, they tried this omnibus class that included everything, including changes in law mid-shift, including COVID testing that did or did not happen. I just think that for certain people, they admit on ECF number 107, note 18, that some class members did not go through COVID testing at all. Even COVID testing ranged, there were four different stages of COVID testing that ranged from car checks to foot baths and temperature scanners on the way in. That ranged throughout the class. Some people were never exposed to it. Some people were actually paid. JA1647, there's some instances where individuals were paid even for that COVID testing. I just think at least on this record, on this class definition, it runs smack dab into what the court said in Bojangles, which is you've defined the class as everybody who worked there. Even those people who did not actually perform any uncompensated work. It would require an individualized trial on a person-by-person, shift-by-shift, day-by-day basis to figure out exactly what everyone was doing. If they want to try on remand for a much narrower class, they're free to try to make that burden. Thank you, Mr. Teich. Thank you for indulging me. We thank you both. I think we'll come down and greet counsel and move into our next case.
judges: J. Harvie Wilkinson III, Julius N. Richardson, Nicole G. Berner